ESTATE OF WILLIAM V. SCHELBERG, SARAH J. SCHELBERG, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1776–77.    Filed August 16, 1978.

*John M. Vine* and *John B. Jones, Jr.*, for the petitioner.
*Joyce H. Errecart*, for the respondent.

RAUM, *Judge:* The Commissioner determined a deficiency in petitioner's Federal estate tax of $12,686.38. The only issue presented is whether the present value of the survivors income benefit payable with respect to the decedent by decedent's employer is includable in decedent's gross estate under section 2039, I.R.C. 1954.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are incorporated herein by this reference.

Petitioner is the Estate of William V. Schelberg, Sarah J. Schelberg, executrix. Sarah J. Schelberg is and at all relevant times has been the sole executrix of decedent's will. At the time of the filing of the petition in this case, Sarah J. Schelberg resided in Chappaqua, N. Y. Decedent's Federal estate tax return was filed with the Director of the Manhattan, New York, District of the Internal Revenue Service.

William V. Schelberg (hereinafter referred to as the decedent) was born on March 14, 1914. He died testate on January 6, 1974, survived by his wife, Sarah, and two daughters, Kathleen Anne (age 23) and Jane Marie (age 19). His estate tax return indicated that the cause of death was lung cancer and that the length of his last illness was 1 week. His will was probated in the Surrogate's Court of Westchester County, N. Y.

At the time of his death, decedent was employed by the International Business Machines Corp. (IBM) as its assistant director of international patent operations at a salary of $4,250 per month. He had been a regular, active, full-time employee of IBM since 1952, but was not an officer of the corporation. He did not have a written employment contract with IBM.

On January 6, 1974, and at all other times relevant to this proceeding, IBM maintained the following plans, among others, for the benefit of its regular employees:

---

[1]The parties have stipulated that the present value of the survivors income benefit in 1974 was $94,708.83. The petitioner has conceded an unrelated adjustment made in the notice of deficiency, and the parties agree that the adjustment relating to the marital deduction is purely computational and dependent upon the other adjustments.

(a) The IBM Group Life Insurance Plan (the Life Insurance Plan);

(b) The IBM Retirement Plan (the Retirement Plan);

(c) The IBM Sickness and Accident Income Plan (the Sickness and Accident Plan); and

(d) The IBM Total and Permanent Disability Income Plan (the Disability Plan).

Each of these plans was adopted at a different time, and each plan was administered as a separate plan.[2] Each was noncontributory: that is, the cost of all of the benefits under each plan was borne entirely by IBM, and IBM's employees were neither required nor permitted to make contributions under any of the plans. As a regular employee of IBM, decedent was entitled to participate in each of these plans according to its terms.

IBM distributed to its regular employees a booklet entitled "About Your Company." Before discussing in detail certain employee benefit plans maintained by IBM, this booklet, as in effect in 1974, made the following statement about the IBM employee benefit plans in general:

Benefits Program

IBM'S benefits program is a non-contributory one: the company bears the full cost of it.

The aim of this program is to provide a broad foundation upon which the individual employee can build in providing for the needs and the well-being of his or her family.

The program is constantly being reexamined and compared with those of other organizations. Over the years, it has been substantially improved and enlarged to meet changing employee needs. These improvements are depicted in the chart on the adjoining page.

The IBM plans provide a foundation for:

Protection—against temporary loss of income and medical expenses resulting from sickness or accident;

Security—by providing an income for retirement, disability or in the case of death;

Opportunity—through educational assistance, vacations and holidays.

You can best decide how to meet individual contingencies by being familiar with all of the coverage provided by IBM. Only in this way can you determine for yourself whether or not you wish to supplement that coverage on your own. Therefore you should read through the various plans in this booklet and become more familiar with the coverage you now have.

---

[2]In addition to the foregoing plans IBM also maintained the following employee health benefit plans for its regular employees: the IBM Family Hospitalization Plan, the IBM Family Surgical Plan, the IBM Family Major Medical Plan, the IBM Family Dental Plan, the IBM Medical Plans with Medicare, and the IBM Special Care for Children Assistance Plan. IBM also maintained educational benefit and other plans for its employees.

IBM's director of employee benefits was responsible for developing and recommending revisions to IBM's benefit plans, including the Life Insurance, Sickness and Accident, and Disability Plans. Such revisions were subject to the approval of IBM's corporate management committee consisting of the chairman of the board of directors, the president, and senior vice presidents of IBM. Changes can and have been made in one plan without affecting the provisions of the other plans. In at least one instance, for example, benefits under the Life Insurance Plan were increased while no change was made in the Disability Plan.

IBM established the Life Insurance Plan in September 1934. While the Life Insurance Plan has been amended on many occasions since that time, it has, since January 1935, provided two basic benefits: (i) group term life insurance, and (ii) an uninsured and unfunded survivors income benefit. The Life Insurance Plan provided group term life insurance pursuant to a group contract between IBM and the Prudential Life Insurance Co. of America. All of IBM's regular employees were provided with term life insurance protection under the contract; benefits were payable to a beneficiary designated by the employee or, failing designation, according to a priority schedule fixed by the plan.

The Life Insurance Plan also provided a survivors income benefit, on an uninsured and unfunded basis; that is, all survivors income benefits were paid out of IBM'S general assets. All regular employees were covered by the survivors income benefit plan, with the amount of the benefit determined on the basis of the employee's compensation at the time of death and the amount of life insurance payable under the group life insurance contract. The benefit was payable only to decedent's "eligible" survivors, who were defined by the plan, in order of preference, as: decedent's surviving spouse (until death or remarriage); then-surviving children under age 23 and dependent upon decedent; then-dependent parents. Payment was made monthly, at the rate of one-quarter of decedent's regular monthly compensation, until the total benefit was exhausted. However, payments continued only so long as there remained at least one eligible survivor. If decedent left no eligible survivor at death, no benefit was payable.

IBM adopted the Retirement Plan in September 1945. Since

its inception, the Retirement Plan has been a qualified pension plan meeting the requirements of section 401, I.R.C. 1954, and predecessor provisions. The Retirement Plan's assets were held in several trust funds, each of which was exempt from Federal income tax under section 501(a) and predecessor provisions. It was IBM's general policy that each employee retire on the last working day of the month in which his or her 65th birthday occurred. However, each corporate officer was required to retire on the last working day of the month in which his or her 60th birthday occurred. Upon retirement at age 65 (60 for corporate officers) with at least 5 years of service with IBM, an employee was entitled to a normal retirement benefit. The Retirement Plan made provision, however, for early retirement benefits in certain cases, and also granted vested rights to retirement benefits to employees leaving IBM prior to retirement age with at least 10 years of IBM service.

IBM established the Sickness and Accident Plan in September 1944. This plan was uninsured and unfunded: that is, all benefits were paid out of IBM's general assets. Under this plan, all regular employees were entitled to receive their regular compensation, while absent from work on account of sickness or accident, for up to 52 weeks in any 24-month period. (Benefits were adjusted, however, for workmen's compensation payments receivable by the employee.) Benefits could be continued beyond 52 weeks, at IBM's discretion, in individual cases. Such extended benefits were known as "individual consideration" benefits.

IBM established the Disability Plan in August 1947. This plan was uninsured and unfunded: that is, all of the benefits under the plan were paid out of IBM's general assets. All regular IBM employees with more than 5 years' service were covered by the plan. Eligibility to receive benefits was determined by a special corporate panel consisting of IBM's medical director, the director of employee benefits, the manager of employee benefits planning, and the manager of employee benefits administration. The panel based its determination entirely upon medical evidence of total and permanent disability, which was defined to mean that the employee was unable to perform any employment for pay or profit and had no reasonable expectation of becoming able to perform such employment. Benefits were payable under the plan, in amounts calculated on the basis of the employee's regular compensation prior to disability and his eligibility for

Social Security payments, from the expiration of the 52-week period of Sickness and Accident Plan benefits (and any period of individual consideration benefits) until the employee's normal retirement date (the last working day of the month of his 65th birthday, in the case of employees who were not corporate officers).[3] Thereafter, the employee was eligible for retirement benefits under the Retirement Plan. During the period of disability payments, the employee was covered by IBM's employee medical plans[4] and by the Life Insurance Plan, including the survivors income benefit. The period of disability payments was not considered service with IBM for purposes of the Retirement Plan.

As of December 31, 1973, IBM employed approximately 150,000 men and women at its plants, laboratories, and offices in the United States. Benefits under the Disability Plan were approved for 98 employees in 1972 and for an additional 93 employees in 1973. As of January 1, 1974, a total of 393 employees were receiving benefits under the Disability Plan.

At the time of his death, decedent had not received any benefits under the Retirement Plan or the Disability Plan. Neither he nor any beneficiary received any benefits from IBM under either plan. The parties have stipulated that no benefits were payable or being paid to decedent at the time of his death under the Sickness and Accident Plan, and that after his death, no beneficiary received any benefits under the Sickness and Accident Plan in respect of decedent.

Sarah J. Schelberg, as decedent's surviving spouse, was entitled to and received under the Life Insurance Plan a death

---

[3] The benefits under the Disability Plan were as follows. For the first 18 months, the monthly benefit was 75 percent of the employee's regular compensation. Ordinarily, the 18-month period began after the employee had received 52 weeks of benefits under the Sickness and Accident Plan. However, if the employee received "individual consideration" benefits under the Sickness and Accident Plan, the period for which the "individual consideration" benefits were paid was applied against the 18-month period under the Disability Plan and reduced the length of that period. At the end of the 18-month (or shorter) period, the monthly benefit payable under the Disability Plan was equal to the greater of (a) 40 percent of the employee's regular monthly compensation when the employee became disabled or (b) the employee's accrued retirement income under the Retirement Plan, based on actual service and earnings through the end of the regular (52-week) Sickness and Accident Plan benefit period. (If an employee were disabled prior to attaining age 55, the employee's service and compensation under the Retirement Plan were projected from the expiration of regular benefits under the Sickness and Accident Plan to the employee's 55th birthday.) Disability benefits were adjusted in cases where the employee was entitled to receive Social Security payments or workmen's compensation.

[4] See n. 2 *supra*. The disabled employee was also covered by the IBM Adoption Assistance Plan.

benefit of $23,666.67 and a survivors income benefit of $1,062.50 per month.[5] The survivors income benefit under the Life Insurance Plan was not included in the gross estate in decedent's Federal estate tax return, but its existence was reported on Schedule I of that return. In his notice of deficiency, the Commissioner determined that the present value of the survivors income benefit was includable in decedent's gross estate pursuant to section 2039.

## OPINION

William V. Schelberg was a regular, active, full-time employee of the International Business Machines Corp. (IBM) when he died on January 6, 1974. Under the terms of the IBM Life Insurance Plan, decedent's widow was entitled, upon his death, to a death benefit of $23,666.67 under a group life insurance policy maintained by the Life Insurance Plan, and to a survivors income benefit of $1,062.50 per month.[6] The sole issue presented is whether the present value in 1974 of the survivors income benefit payable with respect to decedent must be included in decedent's gross estate pursuant to section 2039, I.R.C. 1954.

Section 2039 provides, in pertinent part:

SEC. 2039. ANNUITIES.

(a) GENERAL.—The gross estate shall include the value of an annuity or other payment receivable by any beneficiary by reason of surviving the decedent under any form of contract or agreement entered into after March 3, 1931 (other than as insurance under policies on the life of the decedent), if, under such contract or agreement, an annuity or other payment was payable to the decedent, or the decedent possessed the right to receive such annuity or payment, either alone or in conjunction with another for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death.

(b) AMOUNT INCLUDIBLE.—Subsection (a) shall apply to only such part of the value of the annuity or other payment receivable under such contract or agreement as is proportionate to that part of the purchase price therefor contributed by the decedent. For purposes of this section, any contribution by the decedent's employer or former employer to the purchase price of such contract or agreement (whether or not to an employee's trust or fund forming

---

[5]See n. 6 infra.

[6]Decedent's widow was entitled to receive monthly payments of this survivors income benefit until her death, her remarriage, or the exhaustion of the total amount of the survivors income benefit under the terms of the Life Insurance Plan. If she died or remarried prior to the exhaustion of the fund, monthly payments would by continued to decedent's other eligible survivors, if any. The parties have stipulated that the present value of the survivors income benefit payable with respect to decedent was $94,708.83.

part of a pension, annuity, retirement, bonus or profit-sharing plan) shall be considered to be contributed by the decedent if made by reason of his employment.

    (c) EXEMPTION OF ANNUITIES UNDER CERTAIN TRUSTS AND PLANS. * * *

The section was a new provision in the 1954 Code, and was added to the law in order to clarify the estate tax treatment of joint and survivor annuities purchased in whole or in part by a decedent's employer. See H. Rept. 1337, 83d Cong., 2d Sess. 90–91, A314–A316; S. Rept. 1622, 83d Cong., 2d Sess. 123–124, 469–472; H. Rept. 2543, 83d Cong., 2d Sess. 74. See also *Estate of Fusz v. Commissioner*, 46 T.C. 214, 216. The language of section 2039 is, however, broad enough to go well beyond the precise situation which impelled the change, and the broader objectives of Congress reflected in the language which it used must be kept in mind when applying its provisions. *Bahen's Estate v. United States*, 305 F.2d 827, 833, 834 (Ct. Cl.); *Estate of Allen v. Commissioner*, 39 T.C. 817, 822. One of those objectives was to provide a "satisfactory system for taxing employee death benefits." *Estate of Barr v. Commissioner*, 40 T.C. 227, 234–235.

    Section 2039 sets forth a number of requirements which must be satisfied before the value of an "annuity or other payment" is includable in a decedent's gross estate. The parties are agreed that the survivors income benefit payable in respect of decedent satisfied some of the prerequisites of section 2039. In particular, they are agreed that decedent's surviving spouse was entitled to an "annuity or other payment" within the meaning of section 2039, and that such benefit was payable pursuant to a "contract or agreement" between decedent and IBM, notwithstanding the fact that decedent did not have a written contract of employment. The dispute centers on the requirement that decedent himself, at the time of his death, must have possessed "the right to receive such annuity or payment, either alone or in conjunction with another for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death." The Commissioner determined that decedent's rights under the Disability Plan satisfied that requirement in all respects. The petitioner disputes that determination on various grounds that may conveniently be considered under three principal contentions: first, petitioner argues that the Disability Plan may not be grouped with the Life Insurance Plan, and the survivors income benefit thereun-

der, for purposes of applying section 2039; second, petitioner argues that, even if the two plans are grouped together, the benefit payable to decedent under the Disability Plan does not fall within the term "annuity or other payment" as it is used in section 2039; and finally, petitioner argues that, in any event, decedent did not possess any "right" to payments under the Disability Plan sufficient to invoke section 2039.

(1) Section 20.2039–1(b)(1), Estate Tax Regs., defines the term "contract or agreement," as used in section 2039, to include "any arrangement, understanding or plan, or *any combination of arrangements, understandings or plans arising by reason of the decedent's employment.*" (Emphasis supplied.) In example *(6)*, set forth in section 20.2039–1(b)(2), the Estate Tax Regulations go on to state:

All rights and benefits accruing to an employee and to others by reason of the employment (except rights and benefits accruing under certain plans meeting the requirements of section 401(a) (see section 20.2039–2)) are considered together in determining whether or not section 2039(a) and (b) applies. The scope of section 2039(a) and (b) cannot be limited by indirection.

As we noted earlier, one of Congress' purposes in enacting section 2039 was to provide a satisfactory system for taxing employee death benefits. Congress intended to bring into the gross estate "a large share of employer-contributed payments to an employee's survivors." *Bahen's Estate v. United States*, 305 F.2d at 835. We think the above-quoted Treasury regulations are clearly consistent with the text and the purpose of section 2039, and as such they are binding upon us. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 503; *Bahen's Estate v. United States, supra* at 829; *All v. McCobb*, 321 F.2d 633, 636 (2d Cir.); *Gray v. United States*, 410 F.2d 1094, 1104–1105 (3d Cir.). See *Estate of Beal v. Commissioner*, 47 T.C. 269. Decedent, by reason of his employment with IBM, was entitled to benefits under the Life Insurance Plan and also under the Disability Plan. Applicable Treasury regulations require, therefore, that we consider these two plans together in applying section 2039. And we think that the term "consider together," as used in the regulations, must mean that benefits under every employment-related plan (save qualified pension plans) are to be taken into account in determining whether decedent possessed the right to an "annuity or other payment" as required by section 2039. We

hold, therefore, that decedent's rights under the Disability Plan must be aggregated with his rights under the Life Insurance Plan in determining whether the survivors income benefit payable under the Life Insurance Plan is includable in his gross estate.

Our decision in this regard finds unanimous support in the decided cases. In *Bahen's Estate v. United States*, 305 F. 2d at 835, the Court of Claims held that a death benefit payable to an employee's widow was includable in the decedent's gross estate because decedent also possessed rights under a separate, nonqualified Deferred Compensation Plan maintained by the same employer. In *All v. McCobb*, 321 F.2d at 636, the Court of Appeals for the Second Circuit required aggregation of a death benefit plan and a separate, nonqualified plan maintained by the same employer whereby decedent had been receiving retirement benefits. In *Gray v. United States*, 410 F.2d at 1104–1106, the Court of Appeals for the Third Circuit required inclusion of survivorship benefits in decedent's gross estate because of the existence of a separate nonqualified retirement plan. See also *Estate of Beal v. Commissioner*, 47 T.C. at 272, where this Court refused to separate provisions of a plan relating to death benefits from other provisions relating to retirement benefits.

Petitioner has not called to our attention, nor have we found, a single case where a court refused to aggregate, for the purposes of section 2039, separate employee benefit plans maintained by the same employer. Petitioner asserts, however, that in each of the cited cases the court concluded that there was a factual basis for aggregating separate plans. See *Bahen's Estate v. United States*, 305 F.2d at 835; *Estate of Beal v. Commissioner*, 47 T.C. at 272. We doubt that, under the regulations, it is necessary to inquire into the factual interrelationship of the various employee benefit plans maintained by a single employer. See *All v. McCobb*, 321 F.2d at 636; *Gray v. United States*, 410 F.2d at 1105. But in any event, we conclude from the record before us that this case is not fairly distinguishable in this respect from *Bahen*, *All*, or *Gray* on factual grounds. IBM maintained an integrated employee benefit structure designed, in IBM's own words, to "provide a broad foundation upon which the individual employee can build in providing for the needs and the well-being of his or her family. * * * The IBM plans provide a foundation for: Protection * * * Security * * * [and] Opportunity." IBM had a

single director of employee benefits, responsible directly to the top corporate management, who was responsible for the development and administration of all IBM's employee benefit plans. Taken together, the IBM plans provided for an employee while he was able to work, and also when he could not work because of sickness, disability, or age, and protected the employee's dependents in case of his death. In fact, we conclude that although the "Life Insurance Plan" and the "Disability Plan" were each separately labeled as a plan, and although they were adopted at different times, they were nevertheless merely components of an overall single employee benefit program or major plan that was being enlarged and improved from time to time.

(2) Petitioner next argues that the benefits provided under the Disability Plan were not an "annuity or other payment" as that term is used in section 2039 and the regulations thereunder. The Treasury regulations define the term "annuity or other payment" to mean "one or more payments extending over any period of time. The payments may be equal or unequal, conditional or unconditional, periodic or sporadic." Sec. 20.2039–1(b)(1), Estate Tax Regs. The disability benefits provided under the Disability Plan fall within a literal reading of this definition since they clearly consisted of "one or more payments" to decedent over the "period of time" between disablement and normal retirement age. However, this Court has held that regular salary payments payable in respect of periods of actual work prior to death do not constitute an "annuity or other payment" for purposes of section 2039, notwithstanding the fact that they have not been paid as of the date of death and are therefore "payable" to decedent at his death. *Estate of Fusz v. Commissioner*, 46 T.C. at 218. In that case we stated: "the phrase 'other payment' is qualitatively limited to post-employment benefits which, at the very least, are paid or payable during decedent's lifetime." *Estate of Fusz v. Commissioner, supra* at 218. The Commissioner acquiesced in our holding in *Fusz*, see 1967–2 C.B. 2, and subsequently issued a revenue ruling holding that wage continuation payments payable under a sickness and accident income plan in respect of a period of temporary illness or temporary incapacity do not constitute an "annuity or other payment" under section 2039 where the employee is expected to

return to work after the temporary absence. Rev. Rul. 77–183, 1977–1 C.B. 274.[7]

We must decide, therefore, whether the benefits payable under the Disability Plan constituted compensation or wage continuation payments during a period of absence from work because of sickness, or rather a "post-employment benefit * * * payable during decedent's lifetime." IBM did not grant an employee disability benefits unless it determined that the employee was totally and permanently disabled and would never be able to perform further services for IBM. Indeed, IBM's director of employee benefits testified that the corporation would grant individual consideration benefits under the Sickness and Accident Plan to a disabled employee, rather than placing him on disability benefits, if there appeared to be any chance of his recovering. Thus, although employees receiving disability benefits did occasionally recover and return to work, the company had no expectation of receiving further services from its disabled employees.

We note, as petitioner stresses, that there are various considerations linking the Disability Plan to the Sickness and Accident Plan, which was admittedly a wage continuation plan rather than a "post-employment benefit." In the first place, disability benefits were keyed to benefits under the Sickness and Accident Plan until the latter benefits ran out. Furthermore, a disabled employee continued to receive regular employee health and insurance benefits until he reached normal retirement age, at which time he ceased receiving both disability benefits and regular employee health and insurance benefits, and began receiving benefits as a retired IBM employee. On the other hand, however, there are strong considerations linking the Disability Plan to the IBM Retirement Plan. Once the disabled employee had exhausted both his Sickness and Accident Plan benefits and the initial 18-month period of Disability Plan benefits, his Disability Plan benefit was equal to his accrued benefit under the Retirement Plan if that benefit was higher than 40 percent of his regular monthly compensation as of the date of his disablement. Furthermore, the disabled employee ceased to accrue service credit for retirement purposes, and when he was

[7]Petitioner asserts that Rev. Rul. 77–183 was issued in respect of the IBM Sickness and Accident Plan. Although this is not stated in the text of the ruling, the IBM Sickness and Accident Plan does appear to be covered by the ruling.

transferred to the Retirement Plan at his normal retirement age, his benefits under that plan were calculated on the basis of his service and compensation prior to disablement.

In sum, although it is true that there are similarities between the Disability Plan and the Sickness and Accident Plan, the two are nevertheless on opposite sides of the line drawn by section 2039 between wage continuation plans and post-employment benefits plans. The Disability Plan provides for post-employment benefits while the Sickness and Accident Plan is merely a wage continuation plan contemplating no interruption of the employee's employment relationship with IBM. As in many situations where a line must be drawn, similarities exist between cases close to the line which are, nevertheless, on opposite sides. In this case, we think it is critical that the Disability Plan assured each IBM employee of an income during the period of his disablement notwithstanding the fact that he was never expected to render any services to IBM at any time after his disablement, and for this reason we hold that the Disability Plan benefits were post-employment benefits and therefore an "annuity or other payment" within the meaning of section 2039.

The petitioner, in support of its argument that the Disability Plan benefits were wage continuation payments and not an "annuity or other payment" under section 2039, relies on the fact that the disability payments would have been excludable "wage continuation payments" under section 105(d) of the Code. See sec. 1.105–4(a)(2) and sec. 1.105–4(a)(3)(i), Income Tax Regs. Assuming the correctness of that characterization, we cannot conclude that the treatment of the disability payments under the income tax controls their characterization for purposes of section 2039 of the estate tax. For one thing, the fact that in section 2039, Congress used the term "annuity *or other payment*" does not suggest that Congress intended to reach only annuities taxable under section 72 of the income tax. Compare *DePaolis v. Commissioner*, 69 T.C. 283, 286–288. In addition, the beneficent purposes of Congress underlying section 105(d)—reflecting a limited concern in respect of the income tax liability of wage earners unable to work because of illness—are not necessarily the same as the purposes of section 2039 of the estate tax. Accordingly, the mere fact that the concept of wage continuation has been stretched in order to accommodate the liberal income tax objectives of section 105, is no reason to ignore the

fact that under the IBM system of benefits, the disability payments are predominantly post-employment benefits, not wage continuation payments during a period of temporary absence from work. Indeed, even identical words appearing in different contexts of the same revenue measure may be construed differently. See *Helvering v. Stockholms & c. Bank,* 293 U.S. 84, 86–88; cf. *Rohmer v. Commissioner,* 153 F.2d 61, 65 (2d Cir.). Thus, although the treatment of disability payments under section 105 of the income tax underscores the difficulty in drawing the line, for purposes of section 2039, between wages and "post-employment benefits," we are not convinced that section 105 mandates comparable treatment of disability payments under section 2039 of the estate tax.

Our conclusion that benefits under the IBM Disability Plan constitute an "annuity or other payment" under section 2039 is supported by all of the decided cases which have been brought to our attention or which we have found. The leading case is *Bahen's Estate v. United States,* 305 F.2d at 830. The Court of Claims there squarely held that section 2039 "covers—as an 'other payment,' at least—disability compensation benefits of the type involved here." See also *Gaffney v. United States,* 200 Ct. Cl. 744 (38 AFTR2d 76–6267, 75–2 USTC par. 13,097). Cf. *Hetson v. United States,* 209 Ct. Cl. 209 (38 AFTR2d 76–6266, 76–1 USTC par. 13,124), adopting the recommended decision of the trial judge reported at 36 AFTR2d 75–6505, 75–2 USTC par. 13,098; *Silberman v. United States,* 333 F. Supp. 1120 (W.D. Pa.). Compare *Kramer v. United States,* 406 F.2d 1363, 1367 (Ct. Cl.), where the court found as a fact, on the basis of a stipulation, that certain payments were intended to be and in fact were paid as compensation for services rendered, not as disability or retirement income.

(3) Petitioner argues, finally, that decedent did not, at the time of his death, possess the right to receive payments under the Disability Plan. It is true, of course, that at the time of his death petitioner was not receiving, and was not entitled to receive at that time, any payments under the Disability Plan. And it is at least open to conjecture whether decedent would have become totally disabled, and eligible for Disability Plan payments, before reaching normal retirement age. But section 2039 does not require that decedent possess a *present* right to

receive an annuity or other payment at the time of his death. The regulations state, in this regard:

The decedent "possessed the right to receive" an annuity or other payment if, immediately before his death, the decedent had an enforceable right to receive payments at some time in the future, whether or not, at the time of his death, he had a present right to receive payments. In connection with the preceding sentence, the decedent will be regarded as having had "an enforceable right to receive payments at some time in the future" so long as he had complied with his obligations under the contract or agreement up to the time of his death.

Sec. 20.2039–1(b)(1), Estate Tax Regs. In *Estate of Wadewitz v. Commissioner*, 39 T.C. 925, 936–938, affirmed 339 F.2d 980 (7th Cir.), we held that decedent employee had the requisite right to receive retirement payments from his employer where he had complied, up to his death, with all the terms of his employment. We characterized his right to retirement payments as nonforfeitable because it "could not possibly be forfeited except by his own election." *Estate of Wadewitz v. Commissioner, supra* at 937. Similarly, in *Bahen's Estate v. United States*, 305 F.2d at 831, the Court of Claims held "that at his death Mr. Bahen did 'possess the right' to receive the disability payments in the future if certain conditions were fulfilled." The court reached its conclusion, notwithstanding the fact that Bahen was not disabled and was not receiving disability benefits when he died, because he had fulfilled all his responsibilities under his employment contract up to the time of his death.

Petitioner seeks to distinguish *Wadewitz* and *Bahen* on the ground that, in each of those cases, a particular set of payments was to be received by either decedent or his beneficiaries, depending on the circumstances of decedent's death. But neither court relied on that fact, nor do we regard it as significant. The regulations specifically provide that decedent's right to receive payment may be "conditional," see sec. 20.2039–1(b)(1), Estate Tax Regs. Consequently, under the regulations, decedent can possess the right to receive a payment even though he may never receive anything if events turn out a particular way—as in this case, if decedent had reached retirement age without becoming disabled. Furthermore, the regulation is completely consistent with section 2039 in this respect. Section 2039 requires that both decedent and his beneficiaries have rights in respect of some "annuity or other payment," but it does not require that the beneficiaries receive the *same* "annuity or other payment" as

decedent would have received if he had lived. The fact that the beneficiaries' payments are calculated on a different basis does not produce a difference in result. *Gray v. United States*, 410 F.2d at 1109–1111. We conclude, therefore, that the instant case is not meaningfully distinguishable in this regard from *Wadewitz* and *Bahen*. As an IBM employee, decedent was covered by the Disability Plan. Upon the happening of a contingency over which neither he nor IBM had any control—namely his becoming permanently and totally disabled at least 52 weeks before reaching the normal retirement age of 65—decedent would have become entitled to payments under the Disability Plan.[8] Decedent's right to disability payments was nonforfeitable because he had complied with all the terms of his employment with IBM up until the time of his death. We hold, therefore, that decedent possessed, at the time of his death, the "right to receive" disability payments within the meaning of section 2039.

---

We add a final word. The problem presented by this case is a difficult one, and at least from a purely theoretical point of view the answer is not free from doubt. But there has accumulated in this area a fairly substantial body of decisions, and we do not write upon a clean slate. Petitioner's counsel have ably presented strong arguments in support of their position, and have undertaken to distinguish various cases upon which we rely. However, even if there are possible distinctions as to some of these cases, we are still left with the firm conviction that the dominant thrust of such cases as *Bahen, All, Gray, Hetson, Gaffney, Beal, Wadewitz*, and *Silberman*, requires the conclusion that section 2039 applies to the facts of this case.

*Decision will be entered for the respondent.*

---

[8] Decedent's eligibility to receive disability payments was also subject to the procedural requirement that his total and permanent disability be determined by company physicians. This determination was, as we have found, a purely medical one. IBM did not exercise any discretion in the matter. IBM did have the discretion to carry an employee on "individual consideration" benefits under the Sickness and Accident Plan rather than invoking the Disability Plan. Theoretically, IBM could have carried decedent through to retirement age on "individual consideration benefits." But that does not alter the fact that a disabled employee had the right, at a minimum, to the Disability Plan benefits.