Scott G. MARTIN and Amy L. Mischel, executors of the Estate of James M. Martin, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. CV 85–5512–AAH (McX).

United States District Court, C.D. California.

July 14, 1986.

Schessler & Tribbey by John Schessler, Los Angeles, Cal., for plaintiffs.

Robert C. Bonner, U.S. Atty. by Mason Lewis, Asst. U.S. Atty., Los Angeles, Cal., for defendant.

## MEMORANDUM OF DECISION AND ORDER FOR JUDGMENT FOR PLAINTIFF.

HAUK, Senior District Judge.

## I. PRELIMINARY STATEMENT

This is an action for recovery of internal revenue tax brought by plaintiffs Scott G. Martin and Amy L. Mischel, co-personal executors of the estate of James M. Martin. Plaintiffs allege that defendant United States of America erroneously assessed and collected federal estate tax from them in the amount of $26,262.23.

Decedent was a resident of Pueblo, Colorado. Plaintiff Amy L. Mischel is a resident of Grand Junction, Colorado, and plaintiff Scott G. Martin is a resident of San Bernardino County, California. Both plaintiffs are heirs and principle beneficiaries of the estate of James M. Martin. Jurisdiction is founded on 28 U.S.C. § 1346(a)(1) (1985), which provides for original jurisdiction of actions brought against the United States for recovery of internal revenue tax assessed and paid.

Decedent died June 6, 1980. Shortly thereafter plaintiffs received Letters Testamentary in the Pueblo District Court and are now, and have been since appointment, the duly qualified and acting executors of the estate of James M. Martin.

On or about March 2, 1981, plaintiffs filed a 1980 federal estate tax return, Form 706, for decedent's estate and paid $17,-569.34 tax thereon. Under Schedule I of Form 706, the estate reported but excluded from the decedent's gross estate the value of a lump sum annuities distribution in the amount of $137,684.94, representing $9,689.94 in Keough Plan benefits and $127,995 in Pension Trust funds, which the estate distributed in two equal parts of $68,842.47 to each plaintiff in 1980 after decedent's death. In response to Question 4(a) of Schedule I, plaintiffs elected to exclude the $137,684.94 from the decedent's gross estate as a lump sum distribution described in Section 2039(f)(2) of the Internal Revenue Code, 26 U.S.C. § 2039(f)(2) (1981). Each plaintiff also attached a written election to this effect to the Form 706.

Pursuant to the requirements of Section 2039(f)(2), Amy Mischel correctly reported her distribution of $68,842.47 as ordinary income at the time she filed her 1980 personal income tax return. On or about June 9, 1981, Scott Martin filed his 1980 Form 1040 personal income tax return and his tax accountant reported the $68,842.47 distribution but erroneously claimed capital gains treatment plus 10-year income averaging.

The 1980 income tax returns of the estate and both co-personal executors were audited by the Internal Revenue Service (IRS) on or about November 20, 1981. As a result, the IRS requested Scott Martin to refile his 1980 Form 1040 consistent with his Section 2039(f)(2) election, so as to treat his $68,842.47 distribution as ordinary income.

On or about January 25, 1982, Scott Martin filed a First Amended Form 1040 for 1980, which again the IRS claimed was in error. His accountant abandoned the 10-year income averaging treatment but still erroneously claimed capital gains treatment, even after discussing the matter with the attorneys for the estate. Scott Martin at that time paid additional tax of $4,562, plus a penalty of $684 and interest of $425, for a total of $4,671.

Subsequently, the IRS took the position that Scott Martin's erroneous treatment of his portion of the lump sum distribution on his original and First Amended 1980 Form 1040 necessitated a re-inclusion of the $68,-842.47 into the gross assets of the estate.

Consequently, on April 29, 1982, the IRS assessed the estate $22,379.80 additional tax, plus $3,882.43 interest, totaling $26,-262.23, which assessment the estate paid on August 19, 1982.

Meanwhile, Scott Martin discharged his original accountant and retained Don Fant of Kendall & Foreman Accounting Corporation. On or about May 13, 1982, Mr. Fant filed a Second Amended 1980 Form 1040 for Scott Martin completely excluding the $68,842.47 from Scott Martin's personal income on the basis that such amount had been re-included into the gross assets of the estate, and seeking a refund of $13,855 in personal income taxes already paid by Scott Martin for 1980. The IRS rejected Martin's Second Amended 1980 Form 1040.

On or about March 8, 1983, the estate timely filed a claim for refund of the $26,-262.23 paid on the deficiency assessment, which was rejected by the IRS on August 26, 1983.

Finally, on or about August 27, 1984, a Third Amended 1980 Form 1040 was filed on behalf of Scott Martin, which included the $68,642.47 as ordinary income. The IRS rejected the Third Amended 1980 Form 1040 as untimely and inconsistent with Scott Martin's initial treatment of the distribution as a capital gain with 10-year income averaging.

Plaintiffs filed this action on August 20, 1985, seeking refund of the $26,262.23 as-sessed against and paid by the estate plus interest to date.

Now, after a waiver of jury trial by the parties and a full court trial upon stipulated facts, the Court hereby renders its decision and order for judgment, which shall constitute findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## II. DISCUSSION

A. Scott Martin's Section 2039(f)(2) lump sum distribution election was valid and binding.

This case presents a problem concerning the construction in 1981 of Internal Revenue Code Section 2039(f)(2), 26 U.S.C. § 2039(f)(2) (1981), which deals with the estate tax treatment of lump sum distributions of annuities. The question presented, one of first and perhaps last impression as a result of 1984 regulatory amendments, is whether a tax preparer's errors on a recipient's personal tax return invalidates a good-faith attempt by both the estate and the recipients to elect to exclude a lump sum distribution of qualified plan annuities from a decedent's gross estate.

In general, I.R.C. Section 2039 provides that annuities receivable by a decedent's beneficiary shall be included in the decedent's gross estate unless paid by qualified plans through policies on the life of the decedent.[1] Section 2039(c) excludes from a

---

1. I.R.C. Section 2039, 26 U.S.C. § 2039 (1981), provides in full as follows:

§ 2039. Annuities

(a) General.—The gross estate shall include the value of an annuity or other payment receivable by any beneficiary by reason of surviving the decedent under any form of contract or agreement entered into after March 3, 1931 (other than as insurance under policies on the life of the decedent), if, under such contract or agreement, an annuity or other payment was payable to the decedent, or the decedent possessed the right to receive such annuity or payment, either alone or in conjunction with another for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death.

(b) Amount includible.—Subsection (a) shall apply to only such part of the value of the annuity or other payment receivable under such contract or agreement as is proportionate to that part of the purchase price therefor contributed by the decedent. For purposes of this section, any contribution by the decedent's employer or former employer to the purchase price of such contract or agreement (whether or not to an employee's trust or fund forming part of a pension, annuity, retirement, bonus or profit sharing plan) shall be considered to be contributed by the decedent if made by reason of his employment.

(c) Exemption of annuities under certain trusts and plans.—Notwithstanding the provisions of this section or of any provision of law, there shall be excluded from the gross estate the value of an annuity or other payment (other than an amount described in sub-

section (f)) receivable by any beneficiary (other than the executor) under—

(1) an employees' trust (or under a contract purchased by an employees' trust) forming part of a pension, stock bonus, or profit-sharing plan which, at the time of the decedent's separation from employment (whether by death or otherwise), or at the time of termination of the plan if earlier, met the requirements of section 401(a);

(2) a retirement annuity contract purchased by an employer (and not by an employees' trust) pursuant to a plan which, at the time of decedent's separation from employment (by death or otherwise), or at the time of termination of the plan if earlier, was a plan described in section 403(a);

(3) a retirement annuity contract purchased for an employee by an employer which is an organization referred to in section 170(b)(1)(A)(ii) or (vi), or which is a religious organization (other than a trust), and which is exempt from tax under section 501(a); or

(4) chapter 73 of title 10 of the United States Code.

If such amounts payable after the death of the decedent under a plan described in paragraph (1) or (2), under a contract described in paragraph (3), or under chapter 73 of title 10 of the United States Code are attributable to any extent to payments or contributions made by the decedent, no exclusion shall be allowed for that part of the value of such amounts in the proportion that the total payments or contributions made by the decedent bears to the total payments or contributions made. For purposes of this subsection, contributions or payments made by the decedent's employer or former employer under a trust or plan described in paragraph (1) or (2) shall not be considered to be contributed by the decedent, and contributions or payments made by the decedent's employer or former employer toward the purchase of an annuity contract described in paragraph (3) shall, to the extent excludable from gross income under section 403(b), not be considered to be contributed by the decedent. This subsection shall apply to all decedents dying after December 31, 1953. For purposes of this subsection, contributions or payments on behalf of the decedent while he was an employee within the meaning of section 401(c)(1) made under a trust or plan described in paragraph (1) or (2) shall, to the extent allowable as a deduction under section 404, be considered to be made by a person other than the decedent and, to the extent not so allowable, shall be considered to be made by the decedent. For purposes of this subsection, amounts payable under chapter 73 of title 10 of the United States Code are attributable to payments or contributions made by the decedent only to the extent of amounts deposited by him pursuant to section 1438 or 1452(d) of such title 10.

**(d) Exemption of certain annuity interests created by community property laws.—**In the case of an employee on whose behalf contributions or payments were made by his employer or former employer under a trust or plan described in subsection (c)(1) or (2), or toward the purchase of a contract described in subsection (c)(3), which under subsection (c) are not considered as contributed by the employee, if the spouse of such employee predeceases him, then, notwithstanding the provisions of this section or of any other provision of law, there shall be excluded from the gross estate of such spouse the value of any interest of such spouse in such trust or plan or such contract, to the extent such interest—

(1) is attributable to such contributions or payments, and

(2) arises solely by reason of such spouse's interest in community income under the community property laws of a State.

**(e) Exclusion of individual retirement accounts, etc.—**Notwithstanding the provisions of this section or of any other provision of law, there shall be excluded from the value of the gross estate the value of an annuity receivable by any beneficiary (other than the executor) under—

(1) an individual retirement account described in section 408(a),

(2) an individual retirement annuity described in section 408(b), or

(3) a retirement bond described in section 409(a).

If any payment to an account described in paragraph (1) or for an annuity described in paragraph (2) or a bond described in paragraph (3) was not allowable as a deduction under section 219 or 220 and was not a rollover contribution described in section 402(a)(5), 403(a)(4), section 403(b)(8) (but only to the extent such contribution is attributable to a distribution from a contract described in subsection (c)(3)), 408(d)(3), or 409(b)(3)(C), the preceding sentence shall not apply to that portion of the value of the amount receivable under such account, annuity, or bond (as the case may be) which bears the same ratio to the total value of the amount so receivable as the total amount which was paid to or for such account, annuity, or bond and which was not allowable as a deduction under section 219 and was not such a rollover contribution bears to the total amount paid to or for such account, annuity, or bond. For purposes of this subsection, the term "annuity" means an annuity contract or other arrangement providing for a series of substantially equal periodic payments to be made to a beneficiary (other than the executor) for his life or over a period extending for at least 36 months after the date of the decedent's death.

**(f) Lump sum distributions.—**

**(1) In general.—**An amount is described in this subsection if it is a lump sum distribution described in section 402(e)(4) (determined

decedent's gross estate all qualified plan annuities except those annuities paid through a lump sum distribution described in Section 2039(f).

Section 2039(f)(1) provides that the distribution within one taxable year of the balance of qualified plan annuities which become payable to a recipient on account of an employee's death is a lump sum distribution if the recipient elects capital gains treatment for the distribution on his personal income tax return. Section 2039(f)(2), however, provides that where a recipient irrevocably elects to treat a qualified plan annuities distribution paid within one taxable year as ordinary income, taxable without capital gains treatment or 10-year income averaging, the distribution shall not be treated as a Section 2039(f)(1) lump sum distribution. Thus, where Section 2039(f)(2) applies, an estate may properly exclude a lump sum distribution of qualified plan annuities from its gross assets.

Since decedent's Keough Plan and Pension Trust funds are qualified plans as defined under Section 2039(c), the issue remaining is whether Section 2039(f)(2) applies in this case to effectuate the annuities exclusion of Section 2039(c).

Plaintiffs argue that both recipients as well as the estate properly elected to treat the distribution as a Section 2039(f)(2) distribution, and it was therefore appropriately excluded from the gross estate of the decedent. Plaintiffs rely on the clear intent of the estate and both recipients, as reflected in the estate's affirmative response to the Section 2039(f)(2) election question contained in Schedule I of the Form 706 1980 estate tax return, the additional written election attached to the estate return by each recipient, plaintiff Mischel's proper reporting and treatment of her portion of the distribution on her 1980 personal income tax return, and plaintiff Martin's proper reporting, albeit erroneous treatment, of his portion of the distribution on his 1980 personal income tax return.

Defendant argues that plaintiff Martin's good-faith intent and attempted compliance is irrelevant since in its view only proper tax treatment on an original or first amended return will satisfy the requirements of Section 2039(f)(2). The Court concludes that the IRS's narrow interpretation of Section 2039(f)(2) is incorrect for the reasons set forth below.

The time and manner of compliance with Section 2039(f)(2) is set forth in Treasury Regulation 20.2039–4, Treas.Reg. § 20.-2039–4, T.D. 7761, 1981–1 C.B. 459. *See also* 26 C.F.R. § 20.2039–4 (1981). Treas. Reg. 20.2039–4 provides that an estate may exclude from its gross assets, and avoid tax upon, a lump sum distribution where the recipients of such sum have made a proper Section 402(a)/403(a) taxation election pursuant to Treas.Reg. 20.2039–4(d).[2]

without regard to the next to the last sentence of section 402(e)(4)(A)).

**(2) Exception where recipient elects not to take 10-year averaging.**—A lump sum distribution described in paragraph (1) shall be treated as not described in this subsection if the recipient elects irrevocably (at such time and in such manner as the Secretary may by regulations prescribe) to treat the distribution as taxable under section 402(a) (without the application of paragraph (2) thereof), except to the extent that section 402(e)(4)(J) applies to such distribution.

**2.** Treasury Regulation 20.2039–4, Treas. Reg. § 20.2039–4, T.D. 7761, 1981–1 C.B. 459, provides in full as follows:

**§ 20.2039–4 Lump sum distributions from "qualified plans;" decedents dying after December 31, 1978.**

(a) *Limitation on section 2039(c) exclusion.* This section applies in the case of a decedent dying after December 31, 1978. If a lump sum distribution is paid or payable with respect to a decedent under a plan described in § 20.2039–2(b)(1) or (2) (a "qualified plan"), no amount paid or payable with respect to the decedent under the plan is excludable from the decedent's gross estate under § 20.2039–2, unless the recipient of the distribution makes the section 402(a)/403(a) taxation election described in paragraph (c) of this section. For purposes of this section, an amount is payable as a lump sum distribution under a plan if, as of the date the estate tax return is filed (as determined under § 20.2039–3(d)), it is payable as a lump sum distribution at the election of the recipient or otherwise.

(b) *"Lump sum distribution" defined; treatment of annuity contracts.* For purposes of this section the term "lump sum distribution" means a lump sum distribution defined in section 402(e)(4)(A) that satisfies the require-

Treas.Reg. 20.2039–4(c) defines a proper Section 402(a)/403(a) taxation election as an election by the recipient of a lump sum distribution to treat the distribution as ordinary income, pursuant to Sections 402(a) and 403(a) of the Internal Revenue Code, without regard to capital gains treatment or 10-year income averaging, which is otherwise permissible under Sections 402(a)(2) and 403(a)(2).[3]

ments of section 402(e)(4)(C), relating to the aggregation of certain trusts and plans. A distribution is a lump sum distribution for purposes of this section without regard to the election described in section 402(e)(4)(B). The distribution of an annuity contract is not a lump sum distribution for purposes of this section, and the limitation described in this section does not apply to an annuity contract distributed under a plan. Accordingly, if the amount payable with respect to a decedent under a plan is paid to a recipient partly by the distribution of an annuity contract, and partly by the distribution of an amount that is a lump sum distribution within the meaning of this paragraph (b), § 20.2039–2 shall apply with respect to the annuity contract without regard to whether the recipient makes the section 402(a)/403(a) taxation election with respect to the remainder of the distribution.

(c) *Recipient's section 402(a)/403(a) taxation election.* The section 402(a)/403(a) taxation election is the election by the recipient of a lump sum distribution to treat the distribution as—

(1) Taxable under section 402(a), without regard to section 402(a)(2), to the extent includable in gross income (in the case of a distribution under a qualified plan described in § 20.2039–2(b)(1)),

(2) Taxable under section 403(a), without regard to section 403(a)(2), to the extent includable in gross income (in the case of a distribution under a qualified annuity contract described in § 20.2039–2(b)(2)), or

(3) A rollover contribution, in whole or in part, under section 402(a)(7) (relating to rollovers by a decedent's surviving spouse).

Accordingly, if a recipient makes the election, no portion of the distribution is taxable to the recipient under the 10-year averaging provisions of section 402(e) or as long-term capital gain under section 402(a)(2). However, a recipient's election under this paragraph (c) does not preclude the application of section 402(e)(4)(J) to any securities of the employer corporation included in the distribution.

(d) *Method of election.* The recipient of a lump sum distribution shall make the section 402(a)/403(a) taxation election by—

(1) Determining the income tax liability on the income tax return (or amended return) for the taxable year of the distribution in a manner consistent with paragraph (c)(1) or (2) of this section, or

(2) Rolling over all or any part of the distribution under section 402(a)(7).

If the date the estate tax return is filed precedes the date on which the recipient makes the section 402(a)/403(a) taxation election with respect to a lump sum distribution, the estate tax return may nevertheless reflect the election, as if the election had been made.

(e) *Election irrevocable.* If a recipient of a lump sum distribution files an income tax return (or amended return) or makes a rollover contribution that constitutes the section 402(a)/403(a) taxation election described in paragraphs (c) and (d), the election may not be revoked. Accordingly, a subsequent and amended income tax return filed by the recipient that is inconsistent with the prior election will not be given effect for purposes of section 2039 and section 402 or 403.

(f) *Lump sum distribution to multiple recipients.* In the case of a lump sum distribution paid or payable under a qualified plan with respect to the decedent to more than one recipient, the exclusion under § 20.2039–2 applies to so much of the distribution as is paid or payable to a recipient who makes the section 402(a)/403(a) taxation election.

(g) *Distributions of annuity contracts included in multiple distributions.* Notwithstanding that a recipient makes the section 402(a)/403(a) taxation election with respect to a lump sum distribution that includes the distribution of an annuity contract, the distribution of the annuity contract is to be taken into account by the recipient for purposes of the multiple distribution rules under section 402(e).

Accordingly, pursuant to Treas. Reg. 20.2039–4(d), the timing and method of the estate's initial exclusion of the $137,684.94 lump sum distribution was proper even though the 1980 estate tax return was filed before recipients Mischel and Martin filed their 1980 individual income tax returns.

3. The reference in Treas. Reg. 20.2039–4 to a "Section 402(a)/403(a) election" refers to the election permitted under Internal Revenue Code Sections 402(a) and 403(a), 26 U.S.C. §§ 402(a) and 403(a) (1981), which provide in pertinent part:

**§ 402. Taxability of beneficiary of employees' trust**

**(a) Taxability of beneficiary of exempt trust**

**(1) General rule**

Except as provided in paragraphs (2) and (4), the amount actually distributed to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed, under section 72 (relating to annuities). The

The method for an individual recipient to elect a Section 402(a)/403(a) tax treatment is described in Treas.Reg. 20.2039–4(d), which provides in pertinent part that:

The recipient of a lump sum distribution shall make the section 402(a)/403(a) taxation election by—(1) determining the income tax liability on the income tax return (*or amended return*) for the taxable year of the distribution in a manner consistent with paragraph (c)(1) or (2) of this section.

Treas.Reg. § 20.2039–4(d), T.D. 7761, 1981–1 C.B. 459. *See also* 26 C.F.R. § 20.2039(d) (1981) (emphasis added)

The regulations thus clearly allow a recipient to amend his personal income tax return in the event of improper tax treatment in a Section 402(a)/403(a) election without penalizing the estate for that mistake by re-including the distribution into the gross assets of the estate. In this case plaintiff Martin attempted to amend his 1980 personal income tax return to conform with the appropriate tax treatment described in Treas.Reg. 20.2039–4(d), but the IRS thwarted his compliance by rejecting all but the first amended return.

As set forth in the stipulated facts, both parties agree that plaintiff Martin was the victim of tax preparer error as to both Martin's original and First Amended 1980 Form 1040 personal income tax return.

amount actually distributed to any distributee shall not include net unrealized appreciation in securities of the employer corporation attributable to the amount contributed by the employee (other than deductible employee contributions within the meaning of section 72(o)(5)). Such net unrealized appreciation and the resulting adjustments to basis of such securities shall be determined in accordance with regulations prescribed by the Secretary.

**(2) Capital gains treatment for certain distributions**

In the case of an employee trust described in section 401(a), which is exempt from tax under section 501(a), so much of the total taxable amount (as defined in subparagraph (D) of subsection (e)(4)) of a lump sum distribution as is equal to the product of such total taxable amount multiplied by a fraction—

(A) the numerator of which is the number of calendar years of active participation by the employee in such plan before January 1, 1974, and

(B) the denominator of which is the number of calendar years of active participation by the employee in such plan,

shall be treated as a gain from the sale or exchange of a capital asset held for more than 1 year. For purposes of computing the fraction described in this paragraph and the fraction under subsection (e)(4)(E), the Secretary may prescribe regulations under which plan years may be used in lieu of calendar years. For purposes of this paragraph, in the case of an individual who is an employee without regard to section 401(c)(1), determination of whether or not any distribution is a lump sum distribution shall be made without regard to the requirement that an election be made under subsection (e)(4)(B), but no distribution to any taxpayer other than an individual, estate, or trust may be treated as a lump sum distribution under this paragraph.

## § 403. Taxation of employee annuities
### (a) Taxability of beneficiary under a qualified annuity plan
#### (1) General rule

Except as provided in paragraph (2), if an annuity contract is purchased by an employer for an employee under a plan which meets the requirements of section 404(a)(2) (whether or not the employer deducts the amounts paid for the contract under such section), the employee shall include in his gross income the amounts received under such contract for the year received as provided in section 72 (relating to annuities).

#### (2) Capital gains treatment for certain distributions
##### (A) General rule
If—

(i) an annuity contract is purchased by an employer for an employee under a plan described in paragraph (1);

(ii) such plan requires that refunds of contributions with respect to annuity contracts purchased under such plan be used to reduce subsequent premiums on the contracts under the plan; and

(iii) a lump sum distribution (as defined in section 402(e)(4)(A)) is paid to the recipient, so much of the total taxable amount (as defined in section 402(e)(4)(D)) of such distribution as is equal to the product of such total taxable amount multiplied by the fraction described in section 402(a)(2) shall be treated as a gain from the sale or exchange of a capital asset held for more than 1 year. For purposes of this paragraph, in the case of an individual who is an employee without regard to section 401(c)(1), determination of whether or not any distribution is a lump sum distribution shall be made without regard to the requirement that an election be made under subsection (e)(4)(B) of section 402, but no distribution to any taxpayer other than an individual, estate, or trust may be treated as a lump sum distribution under this paragraph.

Initially, Martin's accountant erroneously claimed capital gains treatment plus 10-year income averaging for Martin's $68,842.47 portion of the lump sum distribution.

Despite a commitment to the Denver IRS office that Martin's 1980 Form 1040 would be refiled consistent with the estate's Section 2039(f)(2) election, and even after consulting with the attorneys for the estate, Martin's original accountant nevertheless erroneously prepared Martin's First Amended income tax return by abandoning the 10-year income averaging but retaining capital gains treatment for Martin's $68,842.47 portion of the lump sum distribution.

The errors in Martin's original and first amended 1980 income tax returns are thus not the result of fraud, deceit, taxpayer negligence or disregard of the Internal Revenue rules or regulations. Rather, they are the result of an accountant's mistaken interpretation of the Internal Revenue Code in spite of being fully apprised of the Section 2039(f)(2) election by Martin, the estate's attorneys, and the Denver IRS service.

The 1981 regulations were silent as to the binding effect of filing a Section 2039(f)(2) election statement, such as was filed with Form 706 by the plaintiffs in this case, where there is a mistake in filing the recipient's personal income tax return. The 1984 amendments to Treas.Reg. 20.2039-4, however, specifically address this issue by adding language to Treas.Reg. 20.2039-4(d) which provides that filing a Section 2039(f)(2) election statement is a valid and binding method of electing to exclude a lump sum distribution from the gross assets of an estate. Treas.Reg. § 20.2039-4(d)(iii), T.D. 7956, EE-86-82. See also 26 C.F.R. § 20.2039-4(iii) (1986). In addition, the language of Treas.Reg. 20.2039-4(e) has been changed to include a provision which states that once a recipient files a Section 2039(f)(2) election statement, the election becomes irrevocable, notwithstanding the filing of any subsequent inconsistent individual tax return. Treas.

Reg. § 20.2039-4(e), T.D. 7956, EE-86-82. See also 26 C.F.R. § 20.2039-4(e) (1986).

■ Although the 1984 regulations were not in effect during the relevant time period in question in this case, they nonetheless set forth an equitable principle which should be applied here. The Court therefore concludes that, in the absence of fraud, deceit or taxpayer negligence, the good-faith attempts by an estate and its recipients to elect Section 2039(f)(2) tax treatment on behalf of the estate constitutes a binding election, notwithstanding the subsequent erroneous treatment by a recipient's personal accountant of a portion of the annuities distribution.

Thus, under the facts and circumstances of this case, the Section 2039(f)(2) election, once timely filed by the estate and both recipients, was not rendered invalid as a consequence of the subsequent errors of Martin's personal accountant with respect to his one-half portion of the $137,684.94 lump sum distribution. The Court notes that the IRS implicitly came to the same conclusion by asking Martin to refile his 1980 personal income tax return to conform with his prior Section 2039(f)(2) election.

Consequently, pursuant to I.R.C. Section 2039(c), plaintiffs properly excluded the entire $137,684.94 lump sum distribution of the qualified plan annuities from the gross assets of the estate and should not have been required to re-include plaintiff Martin's $68,842.47 portion of the distribution into the gross assets of the estate. To hold otherwise would be tantamount to allowing form—in this case the technical treatment of the tax owed by Martin—to govern substance, namely, the intent and good-faith attempts of all parties concerned to effectuate proper compliance with Section 2039(f)(2).

B. The IRS improperly penalized both the estate and Scott Martin for the errors of Martin's original accountant.

After Martin filed his First Amended 1980 Form 1040, the IRS took the unten-

able position that Martin was thereafter foreclosed both from correcting his accountant's mistakes by filing an additional amended return or from accepting his accountant's mistakes by re-instating his 10-year income averaging tax treatment. Thus, the IRS refused to allow Martin to correctly treat his $68,842.47 distribution as ordinary income, as he attempted to do in his third amended return. On the other hand, the IRS refused to allow Martin to treat his distribution as a capital gain with 10-year income averaging, as he attempted to do in his second amended return.

Moreover, the IRS at no time adjusted the incorrect amount of 1980 personal taxes paid by Martin. The IRS did not file a Notice of Deficiency and assess Martin additional tax equal to ordinary income treatment, nor did the IRS refund the additional tax, interest and penalty Martin paid at the time he filed his first amended return to remove the 10-year income averaging treatment.

█ In accordance with I.R.C. Section 402(e)(1)(E), 26 U.S.C. § 402(e)(1)(E) (1981), a recipient shall be liable for any tax imposed on the ordinary income portion of a lump sum distribution. Instead of holding Martin personally liable for correcting the mistakes of his agent-accountant, the IRS in effect attributed the errors of the recipient's agent to the estate and made the estate correct the errors by re-including Martin's portion of the lump sum distribution back into the gross assets of the estate. Defendant, however, has failed to cite case law or demonstrate how mistakes made by Martin's personal accountant, which were clearly contrary to Martin's direction, should operate against, or be rectified by, the estate.

The law is well settled that the ultimate responsibility for a correct tax return lies with the taxpayer who signs and files the return. *Arnold G. Pessin*, 59 T.C. 473, 489 (1972); *Elsie SoRelle*, 22 T.C. 459, 489 (1954). In *SoRelle*, the Court held that the use of hybrid accounting methods with respect to plaintiffs' farming operation was improper, but that the plaintiff wife could

not be penalized for the incorrect record-keeping or accounting methods used by her husband, who exercised exclusive control over the plaintiffs' joint community property, business, and management of affairs. Similarly, in this case the responsibility for rectifying Martin's individual tax return lies with Martin, and not the estate, since it is Martin who directed, and supplied records and information to, his personal accountant.

In addition, the IRS refusal to allow plaintiff Martin to file a third amended return improperly penalized Martin for the mistakes of his accountant. The law provides that a taxpayer may not be assessed a penalty at the time he corrects an underpayment on his individual tax return if the taxpayer supplied full and correct information to his accountant and the errors were solely accountant mistakes. *Arnold G. Pessin*, 59 T.C. 473, 489 (1972). In *Pessin*, the taxpayer, a veterinarian in the business of trading in property rights in horses, failed to supply his accountant with adequate information. The Court held that "[plaintiff] has the burden of establishing that he at least supplied the correct information to his accountant ... and that the incorrect returns were a result of the accountant's mistakes." *Id.* at 489.

In this case both parties have stipulated that Scott Martin's original accountant was supplied with the relevant information with respect to the Section 2039(f)(2) election from Martin as well as by the estate's attorneys and by the IRS, and therefore, that Martin was a "victim" of his accountant's mistakes.

█ Where a taxpayer demonstrates that he acted in good-faith reliance upon the advice of his accountant after full disclosure of relevant facts, and where, as here, the issue is a question of tax law interpretation, the penalty assessment is excused. *Joseph Forni*, 1975 T.C.M. (P–H) ¶ 75,254. In *Forni*, the plaintiff was a commercial art advertiser. He underrepresented his income, took excessive deductions, and was personally careless in keep-

ing his books and records. The Court there stated:

> Only where income is understated because of expert advice as to includability or deductability will reliance on such advice be a good defense against the negligence penalty.

*Id.* at ¶ 75–255

■ Similarly, where a taxpayer is faced with highly complicated transactions and relies totally and reasonably on decisions made by experienced advisors, a penalty is inappropriate. *See Athenaise M. Hill,* 63 T.C. 225, 252 (1974), *aff'd in unpubl'd opinion,* 551 F.2d 313 (9th Cir.1977) (taxpayer, as a member of a group of investors, reasonably relied on accountant's determinations as to depreciation expenses of shopping center buildings); *R.E. Nelson,* 19 T.C. 575, 581 (1952) (taxpayer reasonably relied on accountant's erroneous advice that corporate distributions constituted a loan and was not therefore taxable); *Rhett W. Woody* 19 T.C. 350 (1952) (taxpayer reasonably relied on his accountant's treatment of the sale of taxpayer's interest in a partnership.)

■ In this case it is undisputed that plaintiff Martin provided his original accountant with all relevant information regarding his Section 2039(f)(2) election. In good faith, he reasonably relied on his accountant's advice with respect to the appropriate tax treatment of the $68,842.47 distribution he received, which treatment was derived from the accountant's interpretation of technical estate tax rules and regulations. Indeed, the regulations proved to be beyond the understanding of his accountant, an expert conversant in tax matters. Plaintiff, therefore, cannot reasonably be expected to have detected the errors made on his original or first amended tax return by merely examining the prepared returns. *See, e.g., J.R. Betson, Jr.,* 1984 T.C.M. (P–H) ¶ 84,264.

The facts indicate that plaintiff Martin exercised due diligence to comply with the tax laws. His conduct was at all times reasonable and proper. He timely filed his original and first amended income tax returns, and he promptly paid the amount of tax as determined by his accountant, without dispute. In every instance, once apprised that an error had been made in his income tax return, plaintiff took appropriate measures to remedy the problem, first by directing his original accountant to correct the error, then by firing that accountant and hiring a new accountant when it became apparent that his first accountant could not properly interpret the estate tax rules and regulations. Under these circumstances, the IRS's failure to permit Martin to file his second or third amended 1980 personal income tax return amounted to a penalty against Martin.

It is clear beyond question, and the Court must and does conclude, that the IRS erred in refusing to allow Plaintiff Martin to file an amended tax return treating his $68,842.47 lump sum distribution as ordinary income, and that such conduct on the part of the IRS improperly penalized Martin. The Court also concludes that the IRS erred in requiring the estate to rectify the mistakes of Martin's personal accountant, and that the $26,262.23 deficiency assessed against the estate was, in effect, an improper penalty against the estate.

Accordingly, plaintiff Martin should be permitted by the IRS to file a Second Amended 1980 personal income tax return, treating his $68,842.47 portion of the lump sum distribution as ordinary income. In addition, the IRS should not assess any additional penalty against plaintiff Martin for improperly filing his prior returns, and should refund the $26,262.23 deficiency assessed against the estate.

## III. ORDER FOR JUDGMENT

Upon the stipulated facts adduced in this matter and the law applicable thereto, the Court finds and concludes:

That plaintiffs are entitled to a refund of the $26,262.23 erroneously assessed and paid by the estate on August 19, 1982, together with prejudgment interest thereon at the legal rate of 7 percent, and postjudgment interest at the rate of 6.35 per-

cent, pursuant to 28 U.S.C. Section 1961 (1982);

That plaintiff Scott Martin should be permitted to file, and the IRS shall accept, a Second Amended 1980 Form 1040 personal income tax return treating Martin's $68,-842.47 lump sum distribution from the estate as ordinary income; and that he should be permitted to pay any additional tax still outstanding, together with interest thereon, but without any penalty assessment.

Let judgment be entered in accordance with the findings of fact and conclusions of law set forth in the foregoing Decision and this Order for Judgment.

## JUDGMENT

This matter having come on for nonjury trial before this Court in Courtroom 1 on June 16, 1986; jury having been waived by all parties, and the Honorable A. Andrew Hauk, Judge Presiding;

The Court having considered all the evidence, the law applicable thereto, together with the briefs and arguments of counsel for all parties;

The Court having heretofore made and entered its Memorandum of Decision and Order for Judgment, and its findings of fact and conclusions of law;

And good cause appearing,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, AS FOLLOWS:

1. Plaintiffs Scott G. Martin and Amy L. Mischel, executors of the estate of James M. Martin, are entitled to and shall receive from Defendant United States of America a refund of $26,262.23 erroneously assessed against and paid by the estate of James M. Martin on August 19, 1982, together with pre-judgment interest thereon at the legal rate of 7 percent, and post-judgment interest at the rate of 6.35 percent, pursuant to 28 U.S.C. Section 1961 (1982).

2. Plaintiff Scott Martin shall be permitted to file, and the IRS shall accept, a Second Amended 1980 Form 1040 personal income tax return treating Martin's $68,-842.47 lump sum distribution from the estate as ordinary income; and he shall be permitted to pay any additional tax still outstanding, together with interest thereon, but without any penalty assessment.

3. The Clerk of Court is hereby ordered to serve copies of this judgment on counsel for all counsel of record herein.